# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| FRANCES TAPPS,<br><br>    Plaintiff,<br><br>  v.<br><br>RANDOLPH MCCLENDON, in his individual capacity; JOSEPH P. LOPINTO, III, in his official capacity as Sheriff of Jefferson Parish, Louisiana; and HUM MANAGEMENT, LLC,<br><br>    Defendants. | Case No. ___2:22-cv-13___<br><br>Judge:<br><br>Magistrate Judge:<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

    Plaintiff Frances Tapps ("Ms. Tapps" or "Plaintiff"), by and through her undersigned counsel, files this complaint against Defendants Randolph "Randy" McClendon ("McClendon"), in his individual capacity; Joseph P. Lopinto, III ("Lopinto"), in his official capacity as Sheriff of Jefferson Parish, Louisiana; and HUM Management, LLC ("HUM Management"). Plaintiff hereby states and alleges as follows:

## I. NATURE OF THE ACTION

  1. This case arises from an egregious abuse of power by a former Jefferson Parish Sheriff's Office ("JPSO") patrol deputy, who used his authority as a law enforcement officer and sheriff's office resources in an unsuccessful attempt to intimidate a pregnant Black woman and her family into leaving their Kenner, Louisiana home.[1]

---

[1] *See* John Simerman, "Watch: Bogus eviction attempt of pregnant woman lands Jefferson Parish deputy under internal probe," NOLA.com (March 8, 2021), https://www.nola.com/news/courts/article_025d474a-7ddb-11eb-be08-ffdcab5ee5e7.html.

2.     On January 7, 2021, JPSO Deputy Randy McClendon, dressed in his on-duty uniform, parked his marked patrol car on the street of Frances Tapps' home. McClendon walked up to Ms. Tapps' front door, began pounding on her door and window, and announced that he had been sent by Ms. Tapps' landlord—whom he described as his "partner"—to collect her keys because she was behind on rent. As McClendon spoke, he kept his hand on his holstered firearm.

3.     Although McClendon looked and acted the part of a law enforcement officer, he had no legal authority to evict Ms. Tapps and her family from their home. As McClendon later acknowledged, Ms. Tapps' landlord, HUM Management, had not initiated an eviction proceeding in the court system or otherwise taken lawful action to evict her.

4.     Eventually, McClendon left Ms. Tapps' doorstep. Ms. Tapps—fearful for her safety and that of her family—decided to leave her house and drive to her mother's nearby home. As Ms. Tapps began to back her car out of her driveway with her toddler in the back seat, McClendon intentionally drove his patrol car in front of Ms. Tapps' driveway so as to block her car and did, in fact, prevent her from leaving.

5.     McClendon's conduct constituted an unlawful seizure under the Fourth Amendment to the United States Constitution and Article I, Section 5 of the Louisiana Constitution. McClendon did not have a warrant and lacked probable cause to stop Ms. Tapps. There were no exigent circumstances that justified McClendon's unconstitutional seizure.

6.     Ms. Tapps called the Kenner Police Department ("Kenner PD") and began filming the encounter with McClendon on her phone. McClendon falsely claimed to be Ms. Tapps' landlord, and when Ms. Tapps confronted him about the fact that a Jefferson Parish sheriff's deputy had no role in a private rent dispute, McClendon stated that he was at her home as a "private citizen."

7.     When a Kenner PD officer arrived on the scene, McClendon threatened to take Ms. Tapps to jail.  The officer told McClendon there was no legal basis to evict Ms. Tapps or take her into custody.  The officer also encouraged Ms. Tapps to report McClendon to JPSO, which she later did.

8.     McClendon's misconduct caused extreme trauma and distress to Ms. Tapps, who believed throughout the episode that she and her family members might be harmed.  Four days after the incident, Ms. Tapps went into premature labor.  To this day, Ms. Tapps continues to suffer emotional distress from McClendon's unlawful efforts to evict her.

9.     While Ms. Tapps has suffered immensely, there have been no repercussions for McClendon.  After the incident, JPSO publicly stated that it would investigate McClendon's misconduct and "expect[ed] discipline" to follow the conclusion of the investigation.  But JPSO did not keep its word.  More than four months after the incident, JPSO allowed McClendon to resign while under investigation, and no action was taken against him.

10.    Ms. Tapps also seeks to hold JPSO responsible for the institutional policies and practices that allowed McClendon to be hired and retained as a deputy, despite the fact that he was a known problem in the office and had previously been arrested for abusing the public's trust while working in another municipal role.  Moreover, Ms. Tapps seeks to hold JPSO accountable for failing to implement adequate supervisory policies and for failing to investigate, punish, and seek the decertification of deputies who abuse their power.

11.    Finally, through this case, Ms. Tapps seeks to hold her landlord, HUM Management, vicariously liable for McClendon's misconduct.  In unlawfully attempting to evict Ms. Tapps, McClendon acted at the direction and under the control of HUM Management, which had the legal and practical ability to control McClendon's behavior on its property.

## II. PARTIES

12.    Plaintiff Frances Tapps is a person of majority and, at all relevant times, was a citizen of the United States and a resident of Kenner, Louisiana.

13.    At the time of the events described in this Complaint, Defendant Randy McClendon was a patrol deputy employed by JPSO.  McClendon is sued in his individual capacity and is directly liable for the actions complained of herein.  Based on information and belief, at all relevant times described herein, McClendon was a citizen of the United States and a resident of the Eastern District of Louisiana, and was acting under the color of law.

14.    Defendant Lopinto is currently, and was at all relevant times described herein, Sheriff of Jefferson Parish.  Defendant Lopinto is sued in his official capacity.  At all relevant times described herein, Defendant Lopinto was the final policymaker of JPSO, and had responsibility for the hiring, training, supervision, discipline, and control of appropriate staff to carry out the functions of JPSO.  Based on information and belief, at all times described herein, Lopinto was a citizen of the United States and a resident of the Eastern District of Louisiana, and was acting under the color of law.

15.    Defendant HUM Management is a limited liability company organized under the laws of the State of Louisiana.  At all relevant times described herein, HUM Management owned the residential property located at 2736 Greenwood Street, Kenner, Louisiana, and was Ms. Tapps' landlord.

### III.  JURISDICTION AND VENUE

16.    This action arises under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation, under color of state law, of rights secured both by the United States Constitution and the constitution and laws of the State of Louisiana.

17.    This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) because Plaintiff's claims of federal civil rights violations arise under the Constitution and laws of the United States, including 42 U.S.C. § 1983.  Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over all other claims asserted under the constitution and laws of the State of Louisiana because they are part of the same operative facts and are so related to the federal claims that they are part of the same case or controversy.

18.    Venue in the Eastern District of Louisiana is proper pursuant to 28 U.S.C. § 1391(b)(2) because the wrongful conduct giving rise to Plaintiff's claims occurred in this District.  Venue is also proper under 28 U.S.C. § 1391(b)(1) because, upon information and belief, Defendants McClendon and Lopinto reside in this District, and Defendant HUM Management's principal place of business is in this District.

### IV.  FACTS

**A.   JPSO's History of Misconduct and Racial Discrimination**

19.    JPSO has an unwritten policy and practice of violating individuals' constitutional rights, including through the use of excessive force and unreasonable searches and seizures.[2] These constitutional violations are examined uncritically by JPSO or uninvestigated altogether, and, as a result, they are allowed to continue unpunished.

---

[2] *See, e.g*, Richard A. Webster, "They Saw Me and Thought the Worst," ProPublica.org (Sept. 24, 2021), https://www.propublica.org/article/across-the-parish-line.

20.     The treatment that Ms. Tapps endured by McClendon is also consistent with a long history and pattern of intentional discriminatory treatment of Black residents of Jefferson Parish. By way of example, Sheriff Lopinto's predecessor, Sheriff Newell Norman, whom Lopinto has identified as a "great role model[] [in his] career,"[3] "vowed to stop and question blacks driving 'rinky-dink cars' in white neighborhoods."[4] And in 2006, the same predecessor stated in regard to a new plan to address crime in Jefferson Parish: "We're only stopping black people."[5]

21.     Incidents of violence and misconduct by JPSO have a quantifiable discriminatory impact on the Black community. JPSO currently has an overall police scorecard rating of 44%—one of the worst in Louisiana—according to data scientists who collect, measure, and evaluate policing practices across the United States.[6] This rating measures aggregate levels of police violence, accountability, racial bias, and other policing outcomes.[7] For example, based on data collected from 2013 to 2020, a Black person was 11.3 times more likely to be killed by police than

---

[3] *See* Christopher Tidmore, "From beating Lee to becoming Sheriff, Newell Normand retires," (July 31, 2017), The Louisiana Weekly, http://www.louisianaweekly.com/from-beating-lee-to-becoming-sheriff-newell-normand-retires/.

[4] *See* John Burnett, "Larger-Than-Life Sheriff Rules Louisiana Parish," National Public Radio (Nov. 28, 2006), https://www.npr.org/templates/story/story.php?storyId=6549329.

[5] *See* Adam Nossiter, "Harry Lee, Outspoken Louisiana Sheriff, Dies at 75," The New York Times (Oct. 2, 2007), https://www.nytimes.com/2007/10/02/us/02lee.html.

[6] *See* Police Scorecard, Jefferson Parish Sheriff's Department (2021), https://policescorecard.org/la/sheriff/jefferson-parish. The Police Scorecard, built by a team of data scientists, designers, developers, organizers, and students, is a nationwide public evaluation of policing in the United States; the Police Scorecard calculates levels of police violence, accountability, racial bias, and other policing outcomes for over 16,000 municipal and county law enforcement agencies.

[7] *See id.*; Police Scorecard Project Methodology (2021), https://policescorecard.org/about.

a White person in Jefferson Parish.[8]  JPSO's score for police accountability, only 29%, is also one of the worst measured in the state.[9]

22.    At least 30 federal civil lawsuits have been filed against JPSO since 2010, many of which allege constitutional violations against persons of color.[10]  And, in particular, JPSO is frequently sued for violations of the Fourth Amendment for unreasonable searches and seizures.[11]

## B.  JPSO's Negligent Hiring Practices Allowed McClendon to Join JPSO Despite Prior Misconduct

23.    McClendon was first hired by JPSO in March 2008 as a process server.  At the time, he was also employed as an account clerk for the Jefferson Parish Public School System. McClendon maintained employment with both JPSO and the Jefferson Parish School System from March 2008 until December 2008, when he resigned from his position with the school system.

---

[8] *See* Police Scorecard, Jefferson Parish Sheriff's Department (2021), https://policescorecard.org/ la/sheriff/jefferson-parish.

[9] *See id.*

[10] *See* Kathryn Casteel, "Demanding Accountability: SPLC Sues LA Sheriff's Office," Southern Poverty Law Center (Apr. 16, 2021), https://www.splcenter.org/news/2021/04/16/demanding-accountability-splc-sues-la-sheriffs-office-public-records-regarding-officer.

[11] See, for example, the following lawsuits filed against JPSO from 2011 to 2021: *Carisa Cook v. Kurt Zeagler, et. al.*, No. 2:11-cv-00786 (E.D. La. Apr. 11, 2011); *Antonio Randle v. City of Gretna*, *et. al.*, No. 2:12-cv-01567 (E.D. La. June 19, 2012); *Phillip Digiovanni and Connie Digiovanni v. Arthur Lawson, et. al.*, No. 2:13-cv-00334 (E.D. La. Feb. 22, 2013); *Paul H. Hankins v. Newell D. Normand, et. al.*, No. 2:15-cv-00375 (E.D. La. Feb. 5, 2015); *Yimlah S. Sankofa v. Newell Normand, et. al.*, No. 2:15-cv-01679 (E.D. La. May 18, 2015*); Raymond Foley v. Newell Normand. et. al.*, No. 2:18-cv-00614 (E.D. La. Jan. 19, 2018); *Zamkea Fosselman v. Jefferson Parish Sheriff Office*, *et. al.*, No. 2:18-cv-02637 (E.D. La. Mar. 13, 2018); *Demone Carto v. Paul Carmouche, et. al.*, No. 2:18-cv-10335 (E.D. La. Nov. 13, 2018); *Wachelle Boutte v. Joseph Peter Lopinto, III, et. al.*, No. 2:19-cv-09613 (E.D. La. Apr. 23, 2019); *Leo Lewis v. The Parish of Jefferson, et. al.*, No. 2:20-cv-02032 (E.D. La. July 16, 2020); *Nathan Durapau v. Justin McLin et. al.*, No. 2:21-cv-01157 (E.D. La. June 15, 2021); *Gayl Therese Payton v. Newell Normand, et. al.*, No. 2:21-cv-01325 (E.D. La. July 9, 2021); *Nathasia M. Paul v. John S. Walsdorf, et al.*, No. 2:21-cv-02144 (E.D. La. Nov. 18, 2021).

24.     In January 2009, McClendon was arrested for allegedly stealing more than $9,000 from the Jefferson Parish Public School System.[12]

25.     JPSO allowed McClendon to resign voluntarily from his position within days of his arrest, did not discipline him, and did not take any action that made him ineligible for rehire or prevented him from pursuing law enforcement work with other agencies and departments in Louisiana.  Indeed, after resigning from his position with JPSO in January 2009, McClendon enrolled in the Lafourche Parish Sheriff's Academy and later went on to work for the Harahan Police Department and the St. Charles Parish Sheriff's Office, including as a corrections officer.

26.     In May 2019, McClendon applied for and obtained a position as a JPSO Deputy Field Trainee and was assigned to the Fourth District located on the East Bank of Jefferson Parish.  In September 2019, McClendon was promoted to Deputy II and given a pay increase.

27.     JPSO hired and promoted McClendon despite his previous arrest and resignation from his role as a JPSO process server.  In making the decision to hire and promote McClendon, JPSO either ignored or gave inadequate consideration to his prior arrest and resignation from JPSO.

28.     McClendon's case was not unusual.  JPSO appears to have a well-established practice of allowing officers accused of misconduct to resign while under investigation, only to rehire them later.[13]

---

[12] *See* Michelle Hunter, "Jefferson Parish school clerk arrested for theft," NOLA.com (Jan. 16, 2009), https://www.nola.com/news/article_f4685458-aeee-5668-a1c3-2afd81abf476.html.

[13] *See, e.g.*, Gordon Russel, et al., "A Louisiana police officer resigned under investigation, twice. How did he stay on the force?" NOLA.com (July 25, 2021), https://www.nola.com/news/article_f2abbd32-eb3e-11eb-981d-635ec8afeda3.html (documenting the case of JPSO Deputy Aaron Verrette, who resigned while being investigated by JPSO for criminal misconduct, only to be rehired by JPSO years later in 2020 after stints in other Louisiana law enforcement positions).

### C. McClendon Improperly Attempts to Evict and Unlawfully Seizes Ms. Tapps

29. At the time of the incident, Ms. Tapps resided at 2736 Greenwood Street in Kenner, Louisiana, with her nineteen-year-old daughter and four-year-old son. Ms. Tapps was eight months pregnant, expecting a baby boy.

30. Ms. Tapps had leased and lived in the home since November 2016. HUM Management, which, upon information and belief, is controlled by Abdul Siddiqui and Syeda Siddiqui, purchased the 2736 Greenwood Street property and became Ms. Tapps' landlord in November 2018.

31. On the evening of January 7, 2021, Ms. Tapps was at home with her children, her children's father, Jamal Jones, and her cousin, James Augustine.

32. At approximately 4:50 p.m., the family heard loud and aggressive knocking with a hard object on the front door and window of the home. At that moment, Ms. Tapps was in a back room of the house with her four-year-old son. Frightened by the sounds, Ms. Tapps began to retreat to the kitchen with her son while Mr. Augustine answered the door.

33. When Mr. Augustine opened the door, McClendon, in his JPSO uniform, had his hand on his gun with the holster unfastened, as if he had just put the weapon away. Seeing the uniformed officer in this semi-holstered posture, Ms. Tapps' young child cried out: "He's gonna shoot us!"

34. A heated conversation ensued for approximately twenty minutes between McClendon, who remained on the front doorstep, and the family inside. McClendon told the family that he was there to collect back rent or evict Ms. Tapps and her family from the residence. Ms. Tapps, who was familiar with the eviction process, knew that McClendon could not be right. McClendon had no eviction papers, and a federal moratorium on evictions was in place due to the COVID-19 pandemic.

35.     This was also not the first time that McClendon had attempted to intimidate and harass Ms. Tapps into handing over money or leaving her home.  In May 2020, McClendon came to her home demanding alleged back rent, claiming that he was her landlord's "partner."  During the May 2020 encounter, while peering into her home, McClendon told Ms. Tapps that she had a "nice apartment" and added, "If you can't pay your rent, my things would look good in here."

36.     During the encounter on January 7, 2021, McClendon again insisted that Ms. Tapps' landlord—whom he referred to multiple times as his "partner"—had instructed him to collect back rent from Ms. Tapps or take her keys.[14]  McClendon yelled: "You need to pay the rent, or you need to get the fuck out," and "Get, I need y'all to vacate the premises."

37.     Finally, Ms. Tapps was able to shut her front door on McClendon, at which point she called her mother who lived nearby.  Ms. Tapps' mother told her to come to her home, and that the sheriff's deputy had no right to evict her.

38.     By this point, McClendon had retreated from the front doorstep to his marked JPSO vehicle, parked several homes away on Greenwood Street.  Ms. Tapps took this opportunity to grab her young son and get into her car, which was parked in the front driveway.  Ms. Tapps quickly put her son in the back seat, got into the car, and started the vehicle.  But just as she started to pull out of the driveway, McClendon hurriedly swerved his patrol car to block her driveway and only exit.  Ms. Tapps got out of her vehicle.

39.     The image below, recorded by Ms. Tapps on her cell phone, shows McClendon blocking Ms. Tapps from leaving her driveway:

---

[14] A man responding to a cell phone number for Abdul Siddiqui told a reporter investigating the January 7, 2021 incident that McClendon was "not part of HUM Management, but he's my partner."  *See* John Simerman, "Watch: Bogus eviction attempt of pregnant woman lands Jefferson Parish deputy under internal probe," NOLA.com (March 8, 2021), https://www.nola.com/news/courts/article_025d474a-7ddb-11eb-be08-ffdcab5ee5e7.html.



40.     McClendon continued to berate and intimidate Ms. Tapps verbally from his vehicle: "You're not gonna talk?  You're not gonna give me your key?  I need my key," and "I can put you out right now!"

41.     Ms. Tapps began recording McClendon on her cell phone while confronting him about his misconduct.  At one point during the encounter, Ms. Tapps told McClendon that he was not her landlord, to which he replied, "I am."  When Ms. Tapps stated that a Jefferson Parish sheriff's

deputy had no role in a private rent dispute, McClendon replied that he was at her home as a "private citizen."

42.     Ms. Tapps told McClendon that she could not leave because she was boxed in, but McClendon kept his JPSO patrol car blocking her driveway exit.  Ms. Tapps' four-year-old son remained terrified in the backseat of the car watching the interaction unfold between his mother and a uniformed sheriff's deputy.

43.     Equally scared of McClendon and fearing she would be unable to escape him, Ms. Tapps had called Kenner PD to report what was happening.  Shortly after she called, Officer Keith Seals of the Kenner PD arrived.

## D.   The Kenner Police Department Stops McClendon and Advises Ms. Tapps to Report the Incident to Authorities at JPSO

44.     As Kenner PD Officer Seals arrived on the scene, McClendon flashed his lights in an attempt to speak with him before Ms. Tapps had the opportunity to do so, even though she was the complainant who had called for police assistance.   While Officer Seals was speaking with McClendon, Ms. Tapps approached to tell him what McClendon had done.

45.     Ms. Tapps described the incident to Officer Seals, who then asked McClendon for paperwork relating to the eviction.  McClendon admitted that he did not have an eviction notice to serve, let alone a court order requiring Ms. Tapps to vacate her home.  Still, he attempted to claim that Ms. Tapps had given notice to the landlord that she was moving out—a complete fabrication—and that he was there to collect the key on behalf of the landlord.  Officer Seals also referenced the COVID-19 eviction moratorium and noted that, to his knowledge, a constable was to be involved in evictions.

46.     In Officer Seals' presence, McClendon told Ms. Tapps that he "ought to take her to jail." Officer Seals quickly rebuked McClendon of that notion and reassured Ms. Tapps that she would not be taken to jail.

47.     Officer Seals then went to speak with Ms. Tapps. They moved away from McClendon into the driveway. McClendon tried to follow them, but Officer Seals told him to stay put.

48.     Ms. Tapps showed Officer Seals her lease and other documents that she kept in her car. At this point, Ms. Tapps was in such a frightened state that she recalls her hands shaking as she tried to show Officer Seals the paperwork. None of the papers had any reference to McClendon being involved in the ownership or management of her home.

49.     While Officer Seals was speaking with Ms. Tapps alone, McClendon left in his JPSO vehicle. Officer Seals asked Ms. Tapps if she was okay after McClendon left. Ms. Tapps told him that she was terrified, angry, and upset about what had happened, and that she was especially frightened by the fact that McClendon had unholstered his gun.

50.     Officer Seals advised Ms. Tapps to call the Kenner PD if McClendon returned. He also told Ms. Tapps that she should report the incident to JPSO, file a formal complaint against McClendon, and "beat him" to the station.

**E.   Ms. Tapps Files a Formal Complaint with JPSO over McClendon's Misconduct, and JPSO Fails to Discipline McClendon**

51.     The next morning, on January 8, 2021, Ms. Tapps reported McClendon's misconduct to the Internal Management Division of JPSO. Later that day, Ms. Tapps gave a recorded statement at a JPSO Internal Management Division office in Metairie. The interview was conducted by Sergeant David Canas.

52.     While reporting the incident, Ms. Tapps provided the Internal Management Division with the video evidence she had taken of the incident and a copy of the initial police report drafted

by Officer Seals. Ms. Tapps was told that McClendon had a history of misconduct and was assured that he would face discipline. As reflected on the transcribed record, Sergeant Canas told Ms. Tapps that JPSO would "definitely look into this matter."

53. Recognizing the gravity of McClendon's misconduct, in March 2021, a JPSO spokesperson confirmed to a reporter that JPSO's Internal Management Division was investigating the incident and that the office "expect[ed] discipline to follow." The spokesperson also stated that McClendon's use of JPSO resources during his encounter with Ms. Tapps was "part of the investigation, and [was] also expected to be part of the discipline anticipated after the completion of the investigation."

54. But JPSO never disciplined McClendon and instead allowed him to resign voluntarily once again. JPSO's official records show that McClendon resigned on April 29, 2021—more than four months after the incident with Ms. Tapps.

55. In May 2021, a spokesman for JPSO confirmed that McClendon had resigned. Admitting that no action had been taken against McClendon, the spokesperson stated that "[t]he level of discipline he would have received had not yet been determined at the time of his resignation and is now a moot point."[15]

56. Upon information and belief, JPSO has not taken any action to prevent McClendon from being rehired by JPSO or hired by another law enforcement agency in Louisiana.

57. Days later, in a letter addressed to Ms. Tapps dated May 12, 2021, a major commander of JPSO's Internal Management Division wrote that the investigation had "concluded." The letter

---

[15] *See* John Simerman, "Jefferson Parish sheriff's deputy resigns over eviction attempt in uniform," NOLA.com (May 7, 2021), https://www.nola.com/news/article_9f260baa-aebb-11eb-a3c8-f3cba6133811.html.

did not indicate whether Ms. Tapps' complaint had been substantiated.  Instead, the letter simply stated that McClendon "[was] no longer a member of the Jefferson Parish Sheriff's Office."

**F.  Ms. Tapps Goes into Early Labor and Suffers Ongoing Injuries as a Result of the January 7, 2021 Incident**

58.     On January 11, 2021, just four days after the incident with McClendon,  Ms. Tapps was at the Kenner Housing Authority reporting the January 7, 2021 incident and trying to arrange for new housing when she began experiencing severe stomach pain.  Ms. Tapps immediately went to her doctor, who confirmed that she was in labor and told her to go straight to the hospital.  At the hospital, doctors tried to prevent Ms. Tapps from giving premature birth.

59.     Ms. Tapps ultimately gave birth via emergency C-section.  Due to the emergency procedure and out of concern for Ms. Tapps' and her newborn child's health, she was kept at the hospital multiple additional days for monitoring.  She was also prescribed two new blood pressure medications.

60.     On information and belief, the stress and trauma from the January 7, 2021 incident caused Ms. Tapps to go into early labor.

61.     In addition, Ms. Tapps has experienced severe physiological, emotional, and psychological harms as a result of the incident.  To this day, Ms. Tapps experiences greatly increased anxiety, panic attacks, and sleeplessness as a result of the incident.  She often cannot sleep and experiences nightmares for fear that a law enforcement officer will enter her home and harm her or her children.

62.     Additionally, as a result of the health complications that were caused by the January 7, 2021 incident, Ms. Tapps lost her employment and sole source of income.

## FEDERAL CLAIMS

### COUNT I
### Violation of 42 U.S.C. § 1983 Unreasonable Seizure
### Fourth Amendment to the U.S. Constitution
(Against Defendant McClendon)

63.     Ms. Tapps repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

64.     The Fourth Amendment to the United States Constitution protects citizens against unreasonable searches and seizures by law enforcement officers.

65.     As demonstrated by the facts and circumstances complained of herein, Defendant McClendon seized Ms. Tapps, using force and words a reasonable person would be afraid to ignore, including by physically blocking Ms. Tapps from leaving her residence with his marked JPSO vehicle.

66.     At the time Defendant McClendon seized Ms. Tapps, she had clearly established rights under the Fourth Amendment to the United States Constitution to be free from unreasonable seizure.

67.     Defendant McClendon's unlawful seizure was objectively unreasonable because of the facts and circumstances complained of herein, including because, despite acting under color of law, Defendant McClendon had no actual authority to evict Ms. Tapps from her home, did not have a warrant, and lacked probable cause to believe that Ms. Tapps was engaged in any illegal activity.

68.     As demonstrated by the facts and circumstances complained of herein, Defendant McClendon was, at all relevant times, acting under color of law in his capacity as a JPSO deputy, including because he was wearing his JPSO uniform, driving his JPSO vehicle, holding his JPSO-issued firearm, and threatening to take Ms. Tapps to jail.

69.     As a direct and proximate consequence of Defendant McClendon's acts and omissions, Ms. Tapps has suffered and continues to suffer injury, including emotional distress.

70.     Therefore, Ms. Tapps is entitled to compensatory damages, costs, and attorney's fees under 42 U.S.C. §§ 1983 and 1988 for violation of her clearly established right to be free of unreasonable seizure.

71.     Moreover, the facts and circumstances complained of herein demonstrate that Defendant McClendon engaged in this conduct willfully, intentionally, and with reckless disregard for Ms. Tapps' constitutionally protected rights.  Accordingly, Defendant McClendon is liable for punitive damages for the unlawful seizure of Ms. Tapps, in an amount to be proven at trial.

### COUNT II
#### *Monell* Claim Pursuant to 42 U.S.C. § 1983 Based on Policies, Patterns, or Practices That Subjected Ms. Tapps to an Unreasonable Seizure
(Against Defendant Lopinto, in his official capacity)

72.     Ms. Tapps repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

73.     Defendant Lopinto violated Ms. Tapps' right to be free from an unreasonable seizure under the Fourth Amendment to the United States Constitution.

74.     Defendant Lopinto did so by establishing institutional policies and practices that resulted in the negligent hiring, retention, and supervision of JPSO deputies, including McClendon.  Defendant Lopinto also did so by failing to investigate, punish, and seek the decertification of deputies who abuse their power, including McClendon.

75.     Ms. Tapps was individually harmed by these policies, patterns, and practices because they resulted in the unconstitutional seizure by Defendant McClendon.

76.     At all pertinent times, Defendant Lopinto acted unreasonably, recklessly, and with deliberate indifference and disregard for Ms. Tapps' safety and constitutional rights by establishing the above-described policies, practices, or patterns.

77.     Defendant Lopinto is therefore liable to Ms. Tapps for the violation of constitutional rights described above pursuant to *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978).

## LOUISIANA CLAIMS

### COUNT III
### Violation of Article I, Section 5 of the Louisiana Constitution
(Against Defendant McClendon)

78.     Ms. Tapps repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

79.     Article I, Section 5 of the Louisiana Constitution provides that "[e]very person shall be secured in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy."

80.     As demonstrated by the facts and circumstances complained of herein, Defendant McClendon seized Ms. Tapps, using force and words a reasonable person would be afraid to ignore, including by physically blocking Ms. Tapps from leaving her residence with his marked JPSO vehicle.

81.     At the time Defendant McClendon seized Ms. Tapps, she had clearly established rights under Article I, Section 5 of the Louisiana Constitution to be free from unreasonable seizure and the invasion of her privacy.

82.     Defendant McClendon's unlawful seizure was objectively unreasonable because of the facts and circumstances complained of herein, including because, despite acting under color of law, Defendant McClendon had no actual authority to evict Ms. Tapps from her home and there was otherwise no suspicion that Ms. Tapps was engaged in any illegal activity.

83. As demonstrated by the facts and circumstanced complained of herein, Defendant McClendon was, at all relevant times, acting under the color of law in his capacity as a JPSO deputy, including because he was wearing his JPSO uniform, driving his JPSO vehicle, holding his JPSO-issued firearm, and threatening to take Ms. Tapps to jail.

84. As a direct and proximate consequence of Defendant McClendon's acts and omissions, Ms. Tapps has suffered and continues to suffer injury, including emotional distress.

85. Therefore, Ms. Tapps is entitled to compensatory damages, costs, and attorney's fees for violation of her clearly established right to be free from unreasonable seizure.

86. Moreover, the facts and circumstances complained of herein demonstrate that Defendant McClendon engaged in this conduct willfully, intentionally, and with reckless disregard for Ms. Tapps' constitutionally protected rights. Accordingly, Defendant McClendon liable for punitive damages for the unlawful seizure of Ms. Tapps, in an amount to be proven at trial.

## COUNT IV
### False Imprisonment
(Against Defendant McClendon)

87. Ms. Tapps repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

88. Defendant McClendon unlawfully detained Ms. Tapps for an extended period when he drove his marked, JPSO-issued vehicle in front of Ms. Tapps' driveway, blocking Ms. Tapps' car while she attempted to leave. Ms. Tapps reasonably believed that had she further attempted to leave her home, she would have suffered harm.

89. Defendant McClendon lacked probable cause to stop her from leaving her apartment driveway. At the time, Ms. Tapps was not engaged or reported to have been engaging in any unlawful or suspicious activity.

90.     As a direct and proximate consequence of Defendants McClendon's acts and omissions, Ms. Tapps has suffered and continues to suffer injury, including emotional distress.

91.     Therefore, Ms. Tapps is entitled to damages in an amount to be proven at trial.

## COUNT V
### Intentional Infliction of Emotional Distress
(Against Defendant McClendon)

92.     Ms. Tapps repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

93.     Defendant McClendon's conduct in connection with his unlawful attempt to evict Ms. Tapps and her family from their home was extreme and outrageous. During the encounter with Ms. Tapps, Defendant McClendon used his JPSO cruiser to prevent her from leaving her driveway in her own vehicle without probable cause or exigent circumstances and threatened to take Ms. Tapps to jail without basis.

94.     Defendant McClendon's conduct was beyond all possible bounds of decency and is intolerable in our civilized society, which cannot condone law enforcement officers abusing their official power for personal ends.

95.     Defendant McClendon engaged in this extreme and outrageous conduct because he knew he had no lawful means of evicting Ms. Tapps from her residence. Instead of engaging in a legal eviction process, Defendant McClendon attempted to pressure Ms. Tapps to leave her home. Defendant McClendon knew that by showing up at Ms. Tapps' residence unannounced in his JPSO vehicle and uniform, keeping his hand on his gun, and threatening to take her to jail, it was certain or substantially certain that Ms. Tapps would suffer severe emotional distress.

96.     Ms. Tapps suffered severe emotional distress as a result of Defendant McClendon's conduct.

97.     Therefore, Ms. Tapps is entitled to damages in an amount to be proven at trial.

## COUNT VI
### Negligent Infliction of Emotional Distress
(Against Defendant McClendon)

98.     Ms. Tapps repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

99.     Defendant McClendon committed negligent acts while acting under the color of law.

100.    Defendant McClendon owed Ms. Tapps a duty of care as an officer of the peace and breached that duty of care by harming Ms. Tapps in connection with his unlawful attempt to evict Ms. Tapps and her family from their home on January 7, 2021.

101.    Defendant McClendon acted with reckless disregard for the consequences of his actions and omissions.

102.    Defendant McClendon's negligent acts and omissions caused Ms. Tapps to suffer severe shock and fright, from which she continues to suffer emotional injuries and psychiatric distress.

103.    Therefore, Ms. Tapps is entitled to damages in an amount to be proven at trial.

## COUNT VII
### Negligent Hiring, Retention, and Supervision
(Against Defendant Lopinto, in his official capacity)

104.    Ms. Tapps repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

105.    Defendant Lopinto owed Ms. Tapps a duty to exercise reasonable care in the hiring, retention, and supervision of McClendon.  The position of a sheriff's deputy comes with significant power and authority, and a sheriff's deputy has a unique opportunity to engage in precisely the unlawful conduct alleged herein.  But for the cloak of authority conferred on him by JPSO, Defendant McClendon would not have been able to commit the unconstitutional acts and engage in the tortious conduct described in this Complaint.

106. Defendant Lopinto breached his duty by hiring and retaining Defendant McClendon, despite the fact that Defendant McClendon had previously been arrested and resigned from a position with JPSO. JPSO's pre-hiring investigation of Defendant McClendon was grossly inadequate and did not appropriately account for his history of misconduct. Had JPSO conducted an adequate investigation of McClendon, JPSO would not have hired or retained him.

107. Defendant Lopinto also breached his duty to exercise reasonable care in the supervision of Defendant McClendon. JPSO lacked adequate policies, systems, and controls to ensure that Defendant McClendon did not abuse his position of power by using his authority as a sheriff's deputy to engage in the unlawful activity described herein.

108. As a direct and proximate result of Defendant Lopinto's breach, Defendant McClendon violated Ms. Tapps' constitutional rights under the Fourth Amendment and committed tortious acts against her, causing Ms. Tapps emotional distress and other injuries.

109. Therefore, Ms. Tapps is entitled to damages in an amount to be proven at trial.

## COUNT VIII
### Vicarious Liability
(Against Defendant HUM Management, LLC)

110. Ms. Tapps repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

111. At all relevant times, Defendant McClendon acted at the direction and under the control of Defendant HUM Management, owner of the 2736 Greenwood Street residence and Ms. Tapps' landlord. When Ms. Tapps confronted Defendant McClendon in front of her home, she told him that he was not her landlord, and he replied, "I am." Both before and after the incident, HUM Management's principal, Abdul Siddiqui, repeatedly described McClendon as a "partner." And when a Kenner PD officer arrived in response to Ms. Tapps' call, Defendant told the responding

officer that he had been told that Ms. Tapps was vacating the premises, and he had been sent to retrieve her key.

112.    Because Defendant McClendon acted at the behest of Defendant HUM Management, and Defendant HUM Management, as the property owner, had the practical ability to control Defendant McClendon's conduct on its premises, HUM Management is vicariously liable for McClendon's tortious conduct, as alleged in Counts IV, V, and VI.

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter judgment for the Plaintiff and against each of the Defendants, and grant:

A.    Compensatory damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

B.    Punitive damages on all claims allowed by law against Defendants and in an amount to be determined at trial;

C.    Nominal damages;

D.    A declaration that Defendants McClendon and Lopinto (in his official capacity) violated Ms. Tapps' rights under the Fourth Amendment to the United States Constitution and Article I, Section 5 of the constitution of the State of Louisiana;

E.    Appropriate injunctive relief, including an order directing JPSO to issue a formal disciplinary finding and sanction of Defendant McClendon, and to request that Defendant McClendon's Peace Officer Standards and Training Council certification be revoked;

F.      Reasonable attorney's fees and costs associated with this action under 42 U.S.C. § 1988, including expert witness fees, on all claims allowed by law;

G.      Pre- and post-judgment interest at the lawful rate; and

H.      Such other relief as this Court may deem just and proper.

## VI.  DEMAND FOR JURY TRIAL

Plaintiff hereby requests a jury trial on all claims so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: January 4, 2022

Respectfully submitted,

*/s/ DeWayne L. Williams*
William D. Aaron, Jr. (#2267)
DeWayne L. Williams (#27685)
Anna A. Rainer (#31531)
AARON & GIANNA, PLC
201 St. Charles Ave., Suite 3800
New Orleans, LA 70170
Telephone: (504) 569-1800
Facsimile: (504) 569-1801
Email: waaron@aarongianna.com
       dwilliams@aarongianna.com
       arainer@aarongianna.com

Nora Ahmed*
ACLU Foundation of Louisiana
1340 Poydras Street, Suite 2160
New Orleans, LA 70112
Telephone: (504) 522-0628
Email: nahmed@laaclu.org

Jessica Valenzuela Santamaria*
Reza Harris *
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
Telephone: (650) 843-5000
Email: jvs@cooley.com
       rjharris@cooley.com

Christopher L. Martin, Jr.*
COOLEY LLP
55 Hudson Yards
New York, NY 10001
Telephone: (212) 479-6000
Email: cmartin@cooley.com

Maximilian Sladek de la Cal*
COOLEY LLP
1333 2nd Street, Suite 400
Santa Monica, CA 90401
Telephone: (310) 883-6527
Email: msladekdelacal@cooley.com

Hannah E. Pollack*
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Telephone: (415) 693-2000
Email: hpollack@cooley.com

*Counsel for Plaintiff Frances Tapps*

*Application for *pro hac vice* admission forthcoming