UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**FRANCES TAPPS**                                        **CIVIL ACTION**

**VERSUS**                                              **NO:  22-13**

**RANDOLPH MCCLENDON, IN HIS**                          **SECTION: "S" (4)**
**INDIVIDUAL CAPACITY, ET AL**

ORDER AND REASONS

**IT IS HEREBY ORDERED** that the **Motion for Summary Judgment** (Rec. Doc. 42)

filed by defendant, Hum Management, LLC, is **DENIED**.

BACKGROUND

This suit is a federal civil rights action that alleges that defendant Randolph McClendon,

a former Jefferson Parish Sheriff's Office deputy, used his authority as a law enforcement officer

to attempt to unlawfully evict plaintiff and her family from their Kenner, Louisiana home and to

detain her illegally. According to the complaint, McClendon acted at the direction of plaintiff's

landlord, defendant Hum Management, LLC ("Hum"), and its member-manager, Abdul Faisal

Siddiqui. Plaintiff's suit alleges, <u>inter alia</u>, that Hum is vicariously liable for McClendon's actions

in connection with the attempted eviction.

Plaintiff, Frances Tapps, was a tenant of Hum in a property owned by Hum at 2736

Greenwood Street in Kenner, Louisiana. Hum manager Siddiqui wanted to end the tenancy due

to non-payment issues. On January 7, 2021, he contacted his friend, Jefferson Parish Sheriff's

Deputy Randolph McClendon, and told him that Tapps was packing up to move out  and was

willing to surrender her key, and asked McClendon to pick the key up. McClendon stated that his

time was limited because he had to report to a private detail immediately after his shift ended, but Siddiqui stated that Tapps was ready to give up the key and it would require only a brief stop.[1] McClendon then agreed, and Siddiqui texted McClendon Tapps' phone numbers and the address at which he was to pick up the keys for him.[2]

Subsequent events are very much in dispute. According to Tapps, upon McClendon's arrival, McClendon began beating on Tapps' door with what sounded like a heavy object.[3] When Tapps opened the door, she watched McClendon reholster his gun.[4] McClendon told Tapps "he had to get the key or collect the Housing [Section 8] portion of the rent."[5] He also told her that she needed to "vacate the premises."[6] After telling McClendon that he "should have gone to Eviction Court,"[7] and that she was not going to turn over the key, she slammed the door.[8] Tapps further claims that McClendon then went to his car and yelled that he could "put [her] out right

---

[1] Rec. Doc. 73-1, McClendon Decl. ¶ 3.

[2] Id. at ¶ 4.

[3] Rec. Doc. 74-3, Tapps Depo. 76:23-78:20.

[4] Id.

[5] Id. at 79:7-15.

[6] Rec. Doc. 74-19, Tapps JPSO IAD Statement, Bates No. 391; see also id. at Bates No. 393-394.

[7] Id. at Bates No. 391.

[8] Rec. Doc. 74-3, Tapps Depo. 79:3-6.

now."[9] McClendon then pulled away.[10]

Tapps asserts she then tried to flee with her toddler to her mother's nearby home. According to her, as she began backing out, McClendon reappeared in his JPSO cruiser, physically blocking her in her driveway.[11] Believing she was being detained unlawfully, Tapps called the Kenner Police.[12] After calling the police, Tapps turned on her cellphone camera and began recording.  Shortly thereafter, a Kenner Police officer arrived on scene.

McClendon has provided a very different version of events. According to him, when he arrived at the property he knocked on the door, which was answered by an unidentified man who stated that Tapps was not home and that he knew nothing about a key.[13] McClendon claims that he then got back in his police cruiser and began driving away, and as he did so called Siddiqui to report this turn of events.[12] Siddiqui asked if there was a gray car in the driveway, to which McClendon responded no.[13] As they were speaking, however, McClendon observed a silver car pull into the property driveway.[14] He reported this to Siddiqui, who said that it must be Tapps,

---

[9] Rec. Doc. 74-19, Bates No. 392.

[10] Id.

[11] Rec Doc. 74-3, Tapps Depo. 32:3-6; 32:12-13; 84:6-7; see also Rec. Doc. 74-19, Tapps JPSO IAD Statement, Bates No. 392-393.

[12] Rec. Doc. 74-3, Tapps Depo. 32:19-21; id. at 128:22-23; id. at 132:6-10.

[13] Rec. Doc. 91-1, McClendon 2nd Depo. 10:8-11:7.

[12] Id. at 12:11-13:19.

[13] Id.

[14] Id. at 13:16-19.

and asked McClendon to query her about the key.[15] McClendon backed up so that his car was "lined up" with Tapps' car, rolled down his window, and asked about the key.[16] McClendon testified that the position of his cruiser did not block Tapps in, that he was only stopped there momentarily, and that Tapps never attempted to leave in her car.[17]

McClendon claims his question regarding the key prompted a hostile response from Tapps, who among other things, stated that she had contacted Kenner Police.[18] McClendon states he drove a little ways down the street to be away from Tapps to wait for the Kenner police and to phone Siddiqui once again to report.[19] Siddiqui said he would forward the texts in which McClendon had indicated her willingness to surrender the key so that McClendon could show them to the responding Kenner Police officer to establish he was not there for an illegal eviction.[18]

Prior to Siddiqui's request to collect the key, McClendon had intended to proceed directly from his scheduled JPSO shift to a paid detail late in the afternoon of January 7, 2021.[19] According to McClendon, the only reason he traveled to 2736 Greenwood Street was the request

---

[15] Id. at 13:20-22, 14:22-24.

[16] Id. at 18:10-12; 17:12; 15:11-18.

[17] Id. at 18:15-23; 39:4-25.

[18] Id. at 16:1-6.

[19] Id. at 15:18-25.

[18] Id. at 16:1-16.

[19] Rec. Doc. 73-1, McClendon Decl. ¶ 5.

by Siddiqui to pick up the key on his behalf from Tapps.[20] While Siddiqui had never mentioned Hum Management, LLC or that he was the member manager of Hum Management, LLC, throughout McClendon's acquaintance with Siddiqui he had always made it clear that directly or indirectly Siddiqui owned and controlled certain rental properties and that he exercised all of the authority over those properties one would expect a landlord to exercise.[21]

Siddiqui acknowledged that McClendon worked on Hum properties, doing "whatever [Hum] need[ed] done," including "cutting the grass, cleaning the [properties] out, painting the place."[22] McClendon may also have been involved in the rent collection process.[23] At Hum's Greenwood Street property where Tapps lived, McClendon did plumbing and electrical work, among other things.[24]  When McClendon assisted Siddiqui with repairs or work on his rental properties, Siddiqui made it clear that he controlled the properties and that McClendon should only undertake such work or actions as he directed, as well as giving some direction as to how

---

[20] Id.

[21] Id. at ¶ 7.

[22] Rec. Doc. 74-9, Siddiqui JPSO IAD Statement, Bates No. 434; see also Rec. Doc. 74-5, Hum Depo. 61:17-62:13.

[23] See, e.g., Rec. Doc. 74-11, Text Message (conversation between Siddiqui and Hum tenant in which tenant asks Siddiqui to collect a partial rent payment "so [he] can tell Randy [he] has some of it.").

[24] Rec. Doc. 74-7, McClendon Depo. 211:20-212:13; Rec. Doc. 74-12, Email from Siddiqui to Sheriff Lopinto ("Randy's been out there on several occasions to her apartment to fix things."); Rec. Doc. 74-9, Siddiqui JPSO IAD Statement, Bates. No. 437.

Siddiqui wanted repairs or work performed.[25] Siddiqui acknowledged that the work that McClendon performed was for Hum's benefit, and Siddiqui understood that when he asked McClendon to perform it.[26] When McClendon performed work on Hum's properties, Siddiqui accompanied him[27] and referred to him as his "partner" with Hum's tenants.[28] As a result, Hum's tenants believed that McClendon was "part of Hum Management."[29]

In exchange for working on Hum's properties, McClendon received "significant discount[s]" on hotel rooms in other cities, which Siddiqui procured through his job as a hotel manager.[30] Siddiqui provided more than fifty such discounts, each worth as much as several hundred dollars.[31] On more than one occasion, Siddiqui "put cash in [McClendon's] hand" and told him to spend the money on his kids.[32] McClendon also stated to a JPSO internal affairs investigator that, in exchange for "clean[ing] up between tenants, and get[ting] stuff cleaned, and straight, and fix[ing] stuff, and to basic maintenance, or whatever," Siddiqui "gives [him] ten

---

[25] Rec. Doc. 73-1, McClendon Decl. ¶ 8.

[26] Rec. Doc. 74-5, Hum Depo. 121:17-122:14.

[27] Rec. Doc. 74-7, McClendon Depo. 212:6-17.

[28] Id.

[29] Rec. Doc. 74-5, Hum Depo. 89:14-18; Rec. Doc. 74-11.

[30] Id. at 82:13-82:20; id. at 101:2-4; id. at 85:11-86:5.

[31] Rec. Doc. 74-7, McClendon Depo. 217:2-218:15.

[32] Id. at 215:3-217:1; see also Rec. Doc. 74-13, McClendon JPSO IAD Statement, Bates No. 398.

percent" of building revenue or profits.[33]

According to Siddiqui, McClendon has no relationship to him beyond that of friend,[34] who was picking up the key as a personal favor. He also stated that when he learned that Tapps was resisting handing over her key, he instructed McClendon to leave.[35] In contrast, McClendon has testified that "at no point in time" did Siddiqui instruct him to leave, and in fact, said he was forwarding him Tapps' texts so he could show them to Kenner Police.[36]

Four days after the incident, Tapps, then eight-months pregnant, went into preterm labor. She subsequently filed the instant suit against McClendon in his individual capacity, Sheriff Joseph P. Lopinto, III in his official capacity as sheriff, and Hum Management, LLC. Plaintiff's sole claim against Hum is a vicarious liability claim for the actions of McClendon.[37]

Defendant Hum has moved for summary judgment arguing that there is an absence of record evidence of an employee, agency, or independent contractor relationship between Hum and McClendon, and thus it is entitled to dismissal. Hum also argues that no false imprisonment

---

[33] Rec. Doc. 74-13, McClendon JPSO IAD Statement, Bates No. 402-03 ("[W]e're partners on it okay. He brought me in on it years ago. . . and I've always been the person to go and clean up between tenants, and get stuff cleaned, and straight, and fix stuff and [do] basic maintenance, or whatever. . . . I'm not on the title or anything like that for the building, but he gives me ten percent.").

[34] Rec. Doc. 42-2, Hum Resp. to Interrogs. ¶ 4.

[35] Rec. Doc. 74-5, Hum Depo. 184:8-11.

[36] Rec. Doc. 91-1, McClendon 2nd Depo. 16:11-16.

[37] McClendon has filed a cross-claim against Hum alleging that Hum's negligence was the cause of the events that brought about Tapps' alleged injuries. See Rec. Doc. 32.

occurred, so any vicarious liability against Hum for false imprisonment should be dismissed. Following a stay of the motion to allow plaintiff to conduct further discovery, plaintiff and defendant/cross-claimant McClendon have filed oppositions to the motion, arguing that fact issues precluding summary judgment are present.

## DISCUSSION

### *Legal Standard*

Rule 56 of the Federal Rules of Civil Procedure provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Granting a motion for summary judgment is proper if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits filed in support of the motion demonstrate that there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The court must find "[a] factual dispute . . . [to be] 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party . . . [and a] fact . . . [to be] 'material' if it might affect the outcome of the suit under the governing substantive law." Beck v. Somerset Techs., Inc., 882 F.2d 993, 996 (5th Cir. 1989) (citing Anderson, 477 U.S. 242 (1986).

If the moving party meets the initial burden of establishing that there is no genuine issue, the burden shifts to the non-moving party to produce evidence of the existence of a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The non-movant cannot satisfy the summary judgment burden with conclusory allegations, unsubstantiated assertions, or only a

scintilla of evidence.  <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994) (<u>en banc</u>).

    If the opposing party bears the burden of proof at trial, the moving party does not have to submit evidentiary documents properly to support its motion, but need only point out the absence of evidence supporting the essential elements of the opposing party's case. <u>Saunders v. Michelin Tire Corp.</u>, 942 F.2d 299, 301 (5th Cir. 1991).

***Vicarious Liability***

    Tapps' complaint does not allege specifically whether McClendon's relationship with Hum was one of employee or agent, but it generally alleges a master-servant relationship, specifically that "McClendon acted at the behest of Defendant HUM Management, and Defendant HUM Management, as the property owner, had the practical ability to control Defendant McClendon's conduct on its premises" and thus Hum is vicariously liable for McClendon's tortious conduct for false imprisonment, intentional infliction of emotional distress, and negligent infliction of emotional distress. Cmplt., ¶ 112.

    "A master or employer is liable for the tortious conduct of a servant or employee which is within the scope of authority or employment. . . ." <u>Rowell v. Carter Mobile Homes, Inc.</u>, 500 So. 2d 748, 751 (La. 1987) (citing <u>Blanchard v. Ogima</u>, 215 So.2d 902 (1968); <u>see aso</u>, LA. CIV. CODE art. 2320). A principal is liable for the physical tortious conduct of an agent or mandatary when an agency relationship or mandate exists and "the relationship of the parties includes the principal's right to control physical details of the actor as to the manner of his performance which is characteristic of the relation of master and servant." <u>Id.</u> (citations omitted). Thus, whether one seeks to impose vicarious liability based on an employment or agency relationship, "[t]he

determination of whether a party may be held vicariously liable for the torts of another depends on whether the tortfeasor is characterized as a servant." <u>Whetstone v. Dixon</u>, 616 So.2d 764 (La. App. 1 Cir. 1993).

"A servant is defined as one employed to perform services in the affairs of another and who is subject to the other's control or right to control with respect to the physical conduct in the performance of the services." <u>Price v. North</u>, 331 So. 3d 959, 970  (La. App. 1 Cir. 10/18/21) (citing <u>Ermert v. Hartford Insurance Company</u>, 559 So.2d 467, 476 (La.1990)). In the case of a mandate, the contract between the parties may be gratuitous. LA. CIVIL CODE art. 2992. "Where a volunteer renders a beneficial service for an alleged master in the presence of the master or with the master's knowledge and is permitted to proceed without dissent, an assent may be implied. Thus, the relation of master and servant is established to an extent necessary to render the master liable to third persons for the tortious acts of the volunteer done in the course of such service." <u>Weaver v. City of Shreveport</u>, 276 So. 3d 1091, 1095(La. App. 2 Cir. 8/14/19).

If a master-servant relationship is established, the court then determines whether the tort sued upon was committed with the course and scope of the servant's duties. <u>Normand v. City of New Orleans</u>, 363 So. 2d 1220, 1222 (La. Ct. App. 1978).

> In <u>Baumeister v. Plunkett</u>, the Louisiana Supreme Court set forth a four-part test for vicarious liability: "(1) whether the tortious act was primarily employment rooted; (2) whether the [act] was reasonably incidental to the performance of the employee's duties; (3) whether the act occurred on the employer's premises; and (4) whether it occurred during the hours of employment." Although all four factors need not be satisfied, the determinative question is whether the tortious conduct of the employee was "so closely connected in time, place, and causation to [the employee's] employment-duties, as to be regarded as a risk of harm fairly attributable to the employer's business, as compared with conduct motivated by

10

purely personal considerations entirely extraneous to the employer's interest."

Valenza v. Santos, 2016 WL 7210347, at *3 (E.D. La. Dec. 13, 2016) (quoting Baumeister v. Plunkett, 673 So. 2d 994, 996-97 (La. 1996)).

### *False Imprisonment*

Under Louisiana law, the tort of false imprisonment occurs "when one arrests and restrains another against his will and without statutory authority." Kennedy v. Sheriff of E. Baton Rouge, 935 So. 2d 669, 690 (La. 2006). Thus, the two required elements of the claim are: "(1) detention of a person; and (2) the unlawfulness of such detention." Id. The detention element requires "actual physical restraint or circumstances that would lead a reasonable person to believe [s]he was not free to leave." Harrison v. Vici Properties, Inc., 2022 WL 1470979, at *5 (E.D. La. May 10, 2022) (citations and internal quotations omitted).

Courts have held that an individual being blocked from egress by an officer in a police car meets the standard for detention. For instance, when a police deputy drove up behind a plaintiff's parked car, "and blocked her into the parking spot before proceeding to demand to see her driver's license and question her identity and business at [the adjacent store]", the court held that "this fact defeats [the deputy's] suggestion that [the plaintiff] merely received a summons and therefore was not seized within the meaning of the Fourth Amendment." Babin v. Par. of Jefferson, 2017 WL 2242864, at *9 (E.D. La. May 19, 2017)(Feldman, J.)(citing United States v. Jones, 678 F.3d 293, 298-99 (4th Cir. 2012)(finding that when an officer who is armed and in uniform blocks a defendant's car from leaving the scene a reasonable person would not have felt free to leave). As another court explained:

11

> [W]ould a reasonable person who had started his engine and was about to pull out of a parking lot, but was then blocked by a marked police cruiser and saw a uniformed and armed police officer approaching the driver's side door believe he was free to exit his car and walk away? He would not.

U.S. v. Horton, 2020 WL 5948841, at *6 (S.D. Miss. Oct. 7, 2020); see also United States v. Green, 111 F.3d 515 (7th Cir.1997) (police car followed a car into a driveway where the driver parked the car and the defendant then exited his car, and the court found that the police had seized not only the passenger who remained in the car but also the driver who exited). In an unpublished decision, the Fifth Circuit has stated that when officers parked their unit perpendicular to an individual's vehicle, but the unit was parked so there was still room for the individual to leave and for vehicles to pass between them, no seizure had occurred, implying that a seizure would have occurred if the driver's egress was barred. United States v. Anthony, 487 F. App'x 921, 922 (5th Cir. 2012). As this caselaw suggests, the determination of whether a detention has occurred is inherently factual.

### *Analysis*

Hum argues that it is entitled to summary judgment because it is undisputed that neither Hum nor any Hum employee was present at the time of the incident, that no direct employee, independent contractor, or agency relationship existed between Hum and McClendon, and that Hum did not control or supervise McClendon during the incident. Hum also argues that McClendon did not detain, arrest, or restrain plaintiff, and thus her false imprisonment claim fails.

Fact issues are present on both questions. As to the existence of a master-servant

relationship, while Hum maintains the relationship between Siddiqui and McClendon was merely a friendship, evidence has been submitted that McClendon had worked on Hum properties, doing whatever was needed, including yard work, cleaning, repairs, and possibly rent collection. In the property where Tapps resided, McClendon did plumbing and electrical work, among other things. Siddiqui acknowledges that this work inured to his and Hum's benefit. McClendon stated that he received ten percent of the profits of the properties he worked on, as well as hotel discounts and cash gifts. Siddiqui referred to McClendon as his partner.

McClendon testified that on the date in question, he was only on site because Siddiqui had asked him to collect the key. He claims to have called Siddiqui at least twice to update him on the status of his efforts to collect the key from Tapps and to seek further direction. While Hum argues that even if a mandate existed to collect the key, McClendon's actions exceeded its course and scope when Siddiqui instructed him to leave, it is McClendon's testimony that Siddiqui never asked him to leave and in fact, said he would forward Tapps' texts precisely so McClendon would have them in dealing with Kenner Police. Thus, fact issues exist that preclude a finding that no master-servant or mandate relationship existed between Hum and McClendon.

On the question of false imprisonment, the parties dispute whether any detention occurred, i.e., whether McClendon used his JPSO cruiser to block Tapps in her driveway. While Tapps intends to testify at trial that McClendon did so, and has submitted a video that she contends demonstrates it, McClendon has testified that his car never blocked Tapps' egress and that he stopped only momentarily at the foot of her drive. The resolution of these competing narratives lies with the factfinder, and summary judgment is inappropriate.

For all of the foregoing reasons,

**IT IS HEREBY ORDERED** that the **Motion for Summary Judgment** (Rec. Doc. 42)

filed by defendant, Hum Management, LLC, is **DENIED**.

New Orleans, Louisiana, this ___1st___ day of June, 2023.

**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**

14