UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| FRANCES TAPPS | CIVIL ACTION |
|---|---|
| VERSUS | NO:  22-13 |
| RANDOLPH MCCLENDON, ET AL | SECTION: "S" (4) |

### ORDER AND REASONS

**IT IS HEREBY ORDERED** that the **Motion for Summary Judgment** (Rec. Doc. # 92) filed by defendant, Sheriff Joseph Lopinto, is **DENIED**.

This is a federal civil rights suit that alleges that defendant Randolph McClendon, a former Jefferson Parish Sheriff's Office deputy, used his authority as a law enforcement officer to attempt to unlawfully evict plaintiff and her family from their Kenner, Louisiana home and to detain her illegally. Tapps has sued Sheriff Lopinto in his official capacity pursuant to 42 U.S.C. § 1983 for the alleged negligent hiring of Deputy McClendon.[1]

### I. FACTUAL BACKGROUND

Tapps was a tenant of a property owned by Hum Management ("Hum") at 2736 Greenwood Street in Kenner, Louisiana. Hum manager Faisal Siddiqui desired to end the tenancy due to nonpayment. On January 7, 2021, he contacted his friend, Jefferson Parish Sheriff's Deputy Randolph McClendon, and told him that Tapps had agreed to surrender her key,

---

[1] In addition to Sheriff Joseph P. Lopinto, III in his official capacity, plaintiff sued McClendon in his individual capacity and Hum Management, LLC. Plaintiff has since settled with McClendon and Hum. The sole remaining defendant is Sheriff Lopinto in his official capacity.

and asked that he go by the property to collect it on his behalf. After the telephone conversation, Siddiqui texted to McClendon Tapps' phone numbers and the address at which he was to pick up the key for him.[2] Prior to Siddiqui's request, McClendon had intended to proceed directly from his scheduled JPSO shift to a paid detail late in the afternoon of January 7, 2021.

According to Tapps, on the date of the incident, upon his arrival, McClendon began banging on Tapps' door with what sounded like a heavy object.[3] When Tapps opened the door, she watched McClendon reholster his gun.[4] McClendon told Tapps "he had to get the key or collect the Housing [Section 8] portion of the rent."[5] He also told her that she needed to "vacate the premises."[6] After telling McClendon that he "should have gone to Eviction Court,"[7] and that she was not going to turn over the key, she slammed the door.[8] McClendon then went to his car and yelled that he could "put [her] out right now."[9] McClendon then pulled away.[10]

McClendon out of sight, Tapps claims she tried to flee with her toddler to her mother's

---

[2] Rec. Doc. 42-1, McClendon Decl. ¶4.

[3] Rec. Doc. 4-3, Tapps Depo. 76:23-78:20.

[4] Id.; see also Rec. Doc. 74-7, McClendon Depo. 359:12-14.

[5] Rec. Doc. 4-3, Tapps Depo.79:7-15.

[6] Rec. Doc. 74-19, Tapps JPSO IAD Statement, Bates No. 391; see also id. at Bates No. 393-394.

[7] Id. at Bates No. 391.

[8] Rec. Doc. 4-3, Tapps Depo. 79:3-6.

[9] Rec. Doc. 74-19, Bates No. 392.

[10] Id.

nearby home. As she began backing out, McClendon reappeared in his JPSO cruiser, physically blocking her in her driveway.[11] Believing she was being detained unlawfully, Tapps called the Kenner Police.[12] After calling the police, Tapps turned on her cellphone camera and began recording. The video reflects that after a verbal confrontation, McClendon moved his car a little ways down the street to wait for Kenner Police. Shortly thereafter, a Kenner Police officer arrived on the scene and told McClendon to leave.

McClendon had been employed as a deputy by the JPSO from May 2019 to April 2021, when he resigned while under investigation for the events at issue in this litigation.[13] Prior to joining the JPSO, McClendon had an extensive disciplinary history in law enforcement. McClendon worked as a police officer with the Harahan Police Department from November 2011 to September 2013.[14] During that time, McClendon was disciplined for violating department policies and served a suspension related to an incident involving a member of the public and misuse of police equipment.[15] From September 2013 to April 2019, McClendon

---

[11] Rec Doc. 74-3, Tapps Depo. 32:3-6; 32:12-13; 84:6-7; see also Rec. Doc. 74-19, Tapps JPSO IAD Statement, Bates No. 392-393.

[12] Rec. Doc. 74-3, Tapps Depo. 32:19-21; id. at 128:22-23; id. at 132:6-10.

[13] Rec. Doc. 112-6, McClendon Depo. 172:11-25; Rec. Doc. 112-6, JPSO Interoffice Memo.

[14] Rec. Do. 112-7, Bates No. JPSO_79.

[15] Rec. Doc. 112-6, McClendon Depo. 73:23-74:21.

served as a deputy in the St. Charles Parish Sheriff's Office ("SCPSO").[16] While at SCPSO, McClendon received nearly two dozen citizen complaints and had numerous misconduct violations against him sustained by SCPSO's Internal Affairs Division ("IAD"). Tapps characterizes McClendon's SCPSO disciplinary violations as frequently involving abuses of police power, unprofessional conduct toward civilians, and unlawful detentions, and has submitted documentation of the following from McClendon's 235-plus page SPSCO IAD file:

    • July 2014 – SCPSO IAD sustained a complaint against McClendon for failing to follow policies during the arrest of an impaired person, which led patrons of a bar to believe "the Deputy was attempting to extort a bribe."[17]

    • October 2014 – SCPSO IAD sustained a complaint against McClendon related to improper detention of a civilian whom McClendon subsequently claimed "was a suspicious person because he crossed the street while carrying money in his hand."[18]

    • September 2014 – SCPSO IAD sustained a complaint against McClendon regarding a "self-initiated . . . incident," in which McClendon forcibly arrested a civilian for not having dogs on a leash that were in the civilian's own yard.[19]

    • August 2016 – SCPSO IAD sustained complaints against McClendon for purchasing

---

[16] Rec. Doc 112-8, SCPSO IAD Report, Bates No. TAPPS_230; Rec. Doc. 112-7, Bates No. JPSO_79.

[17] Rec. Doc. 112-8, Bates No. TAPPS 340-341.

[18] Id. at 314.

[19] Id. at 311-312.

alcohol while on-duty and then speeding in his SCPSO marked unit to initiate contact with civilian who allegedly saw McClendon consuming the alcohol shortly after the purchase.[20]

• March 2017 – SCPSO IAD sustained a complaint against McClendon for improper use of excessive force and unprofessional conduct toward a civilian during her arrest, including for calling her a "[f]ucking moron."[21]

• May 2017 through June 2017 – SCPSO IAD sustained complaints against McClendon regarding seven separate traffic stop incidents, including McClendon "unnecessarily extending the time period" of routine traffic stops for seatbelt and speeding violations; McClendon threatening to have a non-U.S. citizen deported if they did not pay a traffic ticket; and McClendon insulting and threatening to take juveniles to jail after "unnecessary" and "unprofessional" lengthy interrogation following traffic stop.[22]

• July 2018 – SCPSO IAD sustained a complaint against McClendon for spitting on an incarcerated offender.[23]

As a result of this history, McClendon was placed in a "Remedial Leadership Program" by SCPSO in 2018.[24] In a December 2018 memo, SCPSO Captain George Breedy summarized McClendon's participation as follows:

---

[20] Id. at 296-297.

[21] Id. at 221-222.

[22] Id. at 191-207.

[23] Id. at 258-259.

[24] Id. at 250-51.

> It is my observation that Deputy [Randolph] McClendon benefitted only
> minimally from the program. . . . Unfortunately he has still not come to the
> realization that our profession is about service to our community and our
> coworkers. . . . This is just another example of the persistence of Deputy
> McClendon to procede [sic] with a course of action he is being told by
> supervisors is not acceptable. In speaking with past and present supervisors, it is
> clear that this is a common action on his part. . . . There has not been a
> progression on his part.[25]

In an April 8, 2019 letter to McClendon, SCPSO Chief Deputy Rodney Madere, Jr. summarized

McClendon's years-long disciplinary history, and concluded that McClendon's "pattern of

unprofessional conduct . . . coupled with [McClendon's] disciplinary history puts us at a liability

for negligent retention by continuing to employ [McClendon]."[26] On April 12, 2019, just one

hour before he was scheduled to meet with Chief Deputy Madere to receive his SCPSO

termination letter, McClendon submitted a letter of resignation.[27] Chief Deputy Madere

specifically requested McClendon's "file reflect . . . he resigned under investigation and was

scheduled to be terminated[.]"[28]

   Later the same month, JPSO hired McClendon, and he began his employment as a JPSO

deputy on or around May 7, 2019.[29] Prior to hiring McClendon, the JPSO requested references

from SCPSO. SCPSO Commander Kenneth DeCorte replied that "McClendon has an extensive

---

[25] Id. at 228-29.

[26] Id. at 232.

[27] Id. at 230.

[28] Id.

[29] Rec. Doc. 112-9, Bates No. JPSO_71.

disciplinary history, he resigned while under investigation and he isn't eligible for rehire."[30] The

SCPSO Human Resources Coordinator also replied in writing exhorting JPSO to "Contact

IAD!"[31] There is no evidence in the record that JPSO followed up based on these responses.

      In addition to his extensive disciplinary history in law enforcement, JPSO was also aware

that McClendon was subject to a restraining order by his ex-wife in California that banned him

from carrying a firearm in that state.[32]

      A few weeks prior to the confrontation with Tapps, McClendon violated JPSO policies

during an altercation with a civilian at the airport.[33] McClendon was "off duty" but driving an

unmarked JSPO vehicle at the time. The events are summarized in the JPSO IAD files as

follows:

> Mrs. Lawrence arrived at the airport and was outside by the baggage claim exit.
> Deputy McClendon was in the waiting departure lane, parked and waiting on his
> family to load the car. Mrs. Lawrence's mother was pulling in the left lane of the
> waiting lanes. As she was approaching to pull over and park the vehicle, Mrs.
> Lawrence was waiting to load her baggage, Deputy McClendon aggressively told
> her, "You need to tell her to stop and let me out." . . . . As Mrs. Lawrence's
> mother began to move forward, Deputy McClendon tried to drive up and not
> allow her to park, almost striking her with his vehicle. . . . Deputy McClendon,
> shortly thereafter, rolled his window down and became belligerent screaming at
> Mrs. Lawrence calling her a bitch and telling her he was going to 10-15 her.
> Deputy McClendon asked Mrs. Lawrence, did she want to go to jail for assault
> and if she knew who the fuck he was. . . . The exchange ended with him speeding

---

[30] Rec. Doc. 112-11, Bates No. JPSO_183.

[31] Id. at _184.

[32] Rec. Doc. 112-13, Depo of JPSO Investigator Eddie Camese, 41:8-44:14; Rec. Doc. 112-17, Bates No. JPSO_282.

[33] Rec. Doc. 112-18.

off almost hitting Mrs. Lawrence.[34]

JPSO sustained the complaint against McClendon, finding him to be in violation of JPSO personal conduct codes and bringing JPSO "into disrepute."[35]

The day after the incident involved in this case, Tapps reported McClendon's misconduct to JPSO IAD.[36] Three months later, the head of JPSO IAD wrote to Sheriff Lopinto that McClendon's conduct was "unprofessional" and violated multiple "department rules and regulations."[37] McClendon voluntarily resigned from JPSO effective on April 28, 2021.[38] Because McClendon resigned before Sheriff Lopinto approved IAD's findings, Tapps' complaint against McClendon was classified "Not Sustained" and McClendon received no formal reprimand.[39]

McClendon retains his Louisiana Peace Officer Standards and Training ("POST") Council certification, required to be a peace officer in Louisiana.[40] Sheriff Lopinto stated that he thought POST certifications were cancelled upon termination or resignation, and that he has "never recommended that a Jefferson Parish Sheriff's Office deputy's certification with the

---

[34] Id. at Bates No. JPSO_573-574.

[35] Id. at 560.

[36] Rec. Doc. 112-22, Bates No. JPSO_389.

[37] Id. at 369.

[38] Rec. Doc. 112-24.

[39] Rec. Doc. 112-22, Bates No. JPSO_359.

[40] Rec. Doc. 112-5, McClendon Depo. 69:5-71:13.

[POST] be suspended or revoked."[41]

Four days after the January 27, 2021 confrontation with McClendon, Tapps, who was then eight-months pregnant, went into preterm labor. She subsequently filed the instant suit seeking to hold Sheriff Lopinto liable for violating her constitutional rights under 42 U.S.C. § 1983 pursuant to Monell v. Dep't of Social Servs., 436 U.S. 658 (1978). Specifically, Tapps alleges that Sheriff Lopinto "acted unreasonably, recklessly, and with deliberate indifference" through institutional policies and practices that "resulted in the negligent hiring, retention, and supervision of JPSO deputies, including McClendon."[42] Tapps also brings claims under Louisiana state law due to Sheriff Lopinto's failure to "exercise reasonable care in the hiring" of McClendon, including because JPSO's "pre-hiring investigation of . . . McClendon was grossly inadequate and did not appropriately account for his history of misconduct."[43] In addition to damages and other related relief, Tapps seeks an order directing JPSO to issue formal disciplinary findings against McClendon and to submit a request that his POST certification be revoked.[45]

Sheriff Lopinto has moved for summary judgment arguing that the claims against him fail because Tapps cannot satisfy the requirement that McClendon was acting "under color of law" at the time of the incident. Sheriff Lopinto further contends that he is not vicariously liable

---

[41] Rec. Doc. 112-25, Lopinto's Answer to Plaintiff's Interrogatory No. 15.

[42] Complaint ¶¶ 74-76.

[43] Id. ¶¶ 104-109.

[45] Id., Prayer for Relief.

for any tortious acts of McClendon because he was not acting within the course and scope of his duties as a JPSO deputy. In his Reply memorandum, Sheriff Lopinto argues for the first time that the threshold requirement of a constitutional violation, in this case Fourth Amendment seizure, has not been met. Tapps opposes, arguing that fact issues exist on whether a seizure occurred, a reasonable jury could conclude that McClendon was acting under color of law, and the course and scope of employment inquiry is irrelevant because her claims against Sheriff Lopinto are not premised on vicarious liability.

## II. DISCUSSION

### *A. Legal Standard*

Rule 56 of the Federal Rules of Civil Procedure provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Granting a motion for summary judgment is proper if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits filed in support of the motion demonstrate that there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The court must find "[a] factual dispute . . . [to be] 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party . . . [and a] fact . . . [to be] 'material' if it might affect the outcome of the suit under the governing substantive law." Beck v. Somerset Techs., Inc., 882 F.2d 993, 996 (5th Cir. 1989) (citing Anderson, 477 U.S. 242 (1986).

If the moving party meets the initial burden of establishing that there is no genuine issue,

the burden shifts to the non-moving party to produce evidence of the existence of a genuine issue

for trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986). The non-movant cannot satisfy the

summary judgment burden with conclusory allegations, unsubstantiated assertions, or only a

scintilla of evidence. <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994) (<u>en banc</u>).

  If the opposing party bears the burden of proof at trial, the moving party does not have

to submit evidentiary documents properly to support its motion, but need only point out the

absence of evidence supporting the essential elements of the opposing party's case. <u>Saunders v.

Michelin Tire Corp.</u>, 942 F.2d 299, 301 (5th Cir. 1991).

### B. 42 U.S.C. § 1983 Claim

  Section 1983 provides a remedy against "every person," who under color of state law,

deprives another of any rights secured by the Constitution and laws of the United States. 42

U.S.C. § 1983; <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658 (1978). Section 1983 is not itself a

source of substantive rights; it merely provides a method for vindicating federal rights conferred

elsewhere. <u>Olabisiomotosho v. City of Hous.</u>, 185 F.3d 521, 525 n. 3 (5th Cir. 1999). To pursue

a claim under section 1983, a plaintiff must: (1) allege a violation of rights secured by the

Constitution or laws of the United States, and; (2) demonstrate that the alleged deprivation was

committed by a person acting under color of state law. <u>Sw. Bell Tel., LP v. City of Hous.</u>, 529

F.3d 257, 260 (5th Cir. 2008); <u>see also</u> <u>West v. Atkins</u>, 487 U.S. 42 (1988).

  Claims against police officers in their official capacities are treated as claims against the

municipality that the officers serve. <u>Brooks v. George Cnty.</u>, 84 F.3d 157, 165 (5th Cir.1996).

While a municipality may not be held vicariously liable under section 1983 for the acts of its

employees, it may be subject to liability pursuant to section 1983 when the municipality maintains an unconstitutional policy or custom. Valle v. City of Houston, 613 F.3d 536, 542 (5th Cir. 2010) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978)). The Fifth Circuit has identified at least three ways in which plaintiffs may meet their burden to show a policy or custom. Burge v. Par. of St. Tammany, 187 F.3d 452, 471 (5th Cir. 1999). The first two require direct action by a "policymaker," either in the form of generally applicable policies or specific, directed actions. Id. The third is present when there is a failure to act by policymakers and "the need to take some action to control [its agents] 'is so obvious, and the inadequacy of existing practice so likely to result in a violation of constitutional rights, that the policymaker ... can reasonably be said to be deliberately indifferent to the need.' " Id. (internal quotations omitted). Thus, "a municipality may incur § 1983 liability for its employees' acts when a municipal policy of hiring or training causes those acts." Benavides v. Cty. of Wilson, 955 F.2d 968, 972 (5th Cir. 1992). To prove liability under this theory, a plaintiff  "must show (1) the training or hiring procedures of the municipality's policymaker were inadequate; (2) the municipality's policymaker was deliberately indifferent in adopting the hiring or training policy; and (3) the inadequate hiring or training policy directly caused the plaintiff's injury." Id.

### 1. Constitutional Violation

The first inquiry in any § 1983 suit . . . is whether the plaintiff has been deprived of a right "secured by the Constitution and laws." Baker v. McCollan, 443 U.S. 137, 140 (1979). The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. CONST. amend. IV. "A person is seized by the police and thus entitled to challenge the government's action under the

Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement, through means intentionally applied." Brendlin v. California, 551 U.S. 249, 254 (2007) (citations and internal quotation marks omitted). Even "brief seizures are seizures all the same." Torres v. Madrid, 141 S. Ct. 989, 999 (2021).

In this case, the alleged seizure was effected by Deputy McClendon's blocking plaintiff's vehicle in her driveway, a show of authority, rather than by physical force.[46] When a seizure is made without physical force, it requires both a show of authority by law enforcement officers and "submission to the assertion of authority" by the seized individual. California v. Hodari D., 499 U.S. 621, 628 (1991).

Sheriff Lopinto does not argue that an officer blocking in a plaintiff's vehicle does not constitute a show of authority. Rather, he claims that plaintiff's vehicle was never completely blocked in (a disputed factual question),[47] and argues that no seizure ever occurred in this case, because no seizure was intended by McClendon or yielded to by plaintiff.

**a. Intent**

Sheriff Lopinto argues that McClendon did not have a law enforcement goal in blocking

---

[46] A seizure effected by police cars blocking in an individual's car involves non-physical contact and is a seizure by show of authority. See, e.g., United States v. Johnson, 2022 WL 35406, at *3 (6th Cir. Jan. 3, 2022); see also, United States v. Bady, 503 F. App'x 481, 484 (7th Cir. 2013) (attempt to position car to block in defendant "unquestionably qualif[ies] as show[] of authority").

[47] The video submitted by plaintiff and relied upon by both parties in arguing this point begins *in medias res* and does not capture the entire interaction. It is also inconclusive as to whether the driveway was so completely blocked by McClendon's cruiser that Tapps could not leave.

13

plaintiff's vehicle in, and thus he lacked the requisite intent for a Fourth Amendment seizure.

A seizure occurs when an officer "*objectively* manifests an intent to restrain" the liberty of an individual through either use of physical force or a show of authority. United States v. Wright, 57 F.4th 524, 530–31 (5th Cir. 2023) (quoting Torres, 141 S. Ct. at 998 (emphasis in original). For that reason, the United States Supreme Court has indicated that "we rarely probe the subjective motivations of police officers in the Fourth Amendment context." Torres, 141 S. Ct. at 998. Thus, McClendon's subjective motivations for his actions are irrelevant. The question is whether what is alleged here – an armed, uniformed police officer using his marked police cruiser to block an individual in her driveway and prevent her from leaving – objectively manifests an intent to restrain.

If the jury determines that McClendon's vehicle did in fact block Tapps' egress from her driveway, it could also reasonable find that McClendon's alleged actions objectively manifested an intent to restrain. This is buttressed by the fact that numerous cours have found that actions like McClendon's constitute a seizure. For instance, the Fifth Circuit has found a seizure when a police car pulled alongside a defendant's vehicle so closely that it "effectively restrained the movement of [the defendant] and his passenger." United States v. Beck, 602 F.2d 726, 729 (5th Cir. 1979); see also, United States v. Flowers, 6 F.4th 651 (5th Cir. 2021) (assuming without deciding that a seizure occurred when several police cars surrounded defendant's car). Other circuits have reached the same conclusion on similar facts. See, e.g., United States v. Green, 111 F.3d 515, 520 n.1 (7th Cir.1997) (police followed a car into a driveway where the driver parked the car and the defendant then exited his car; although the driver was walking away from his car

14

toward a house, when "the officers pulled their car in behind the [defendant's car], blocking the car's exit ... a reasonable person would not feel that he was free to leave."); see also, United States v. Jones, 678 F.3d 293, 301 (4th Cir. 2012) (listing cases). Because the same activity allegedly undertaken by McClendon has repeatedly been determined to be a seizure, a reasonable jury could conclude the challenged conduct objectively manifests an intent to restrain. Accordingly, summary judgment premised on a lack of intent by McClendon is inappropriate.

   **b. Submission to authority**

   Sheriff Lopinto further argues that because Tapps called Kenner Police to report her detention and stayed until Kenner Police responded, she did not yield to McClendon's authority, as required to establish a Fourth Amendment seizure. But simply because Tapps made an effort to appeal to another authority does not mean that she did not also submit to McClendon's restraint. According to Tapps, McClendon blocked her vehicle in, and for some period of time, she could not and did not attempt to leave. "[W]hen an individual's submission to a show of governmental authority takes the form of passive acquiescence, ... [the] test for telling when a seizure occurs . . . [is whether] 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that [s]he was not free to leave.' " Brendlin v. California, 551 U.S. 249, 255, (2007) (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980)).

   As noted in the court's prior decision denying summary judgment to Hum (Rec. Doc. 96), one court has explained:

> [W]ould a reasonable person who had started his engine and was about to pull out of a parking lot, but was then blocked by a marked police cruiser and saw a uniformed and armed police officer approaching the driver's side door believe he

was free to exit his car and walk away? He would not.

U.S. v. Horton, 2020 WL 5948841, at *6 (S.D. Miss. Oct. 7, 2020). In this case, plaintiff has submitted evidence that after previously brandishing his weapon, McClendon blocked her exit with his patrol car, and at one point exited his car during the confrontation.[48] McClendon disagrees with this interpretation of the evidence. In light of the disputed fact issues regarding what actually took place, and because depending on how those issues are ultimately resolved reasonable jurors could find that a seizure occurred, summary judgment is inappropriate on this issue.

### 2. Whether McClendon was Acting "Under Color of Law"

Another prerequisite to finding section 1983 liability is a determination that McClendon was acting "under color of law" during the incident with Tapps. To determine whether an officer acted under color of law, courts consider:  "(1) 'whether the officer misused or abused his official power' and (2) 'if there is a nexus between the victim, the improper conduct, and the officer's performance of official duties.' " Gomez v. Galman, 18 F.4th 769, 776 (5th Cir. 2021) (quoting  Bustos v. Martini Club, Inc., 599 F.3d 458, 464–65 (5th Cir. 2010))."Whether a police officer is acting under color of state law does not depend on his on- or off-duty status at the time of the alleged violation." Tyson v. Sabine, 508 F.4th 508, 522 (5th Cir. 2022); United States v. Tarpley, 945 F.2d 806, 809 (5th Cir.1991). In addition, "officials who act for purely personal reasons do not necessarily fail to act 'under color of law.' " Tarpley, 945 F.2d at 809.  Rather, "even if an officer acts for purely personal reasons, he or she may still act under color of law if

---

[48] Rec. Doc. 1, ¶ 39 (photograph).

they are 'acting by virtue of state authority.' " Id.  "It is only '[i]f an officer pursues personal objectives without using his official power as a means to achieve his private aim[ ] [that] he has not acted under color of state law.' " Id.

Sheriff Lopinto argues that McClendon was not acting under color of law because Tapps has failed to allege specific actions by McClendon that would lead to the conclusion that he was acting as a police officer. Instead, according to Sheriff Lopinto, Tapps' allegations indicate McClendon was acting as a private citizen, because "[d]uring the encounter on January 7, McClendon again insisted that Tapps' landlord – who he referred to as his 'partner' – had instructed him to collect back rent from Tapps or take her keys."[49] Further, "[a]t one point during the encounter, Tapps told McClendon that he was not her landlord, to which he replied, 'I am.' When Tapps stated that a Jefferson Parish sheriff's deputy had no role in a private rent dispute, McClendon replied that he was at her home as a 'private citizen.' "[50] "McClendon admitted that he did not have an eviction notice to serve, let alone a court order requiring Ms. Tapps to vacate her home."[51] Sheriff Lopinto also argues that it is uncontested that at the relevant time, McClendon was acting as an agent for and on behalf of Faisal Siddiqui and/or HUM Management and that Siddiqui had the right to control McClendon's actions at the time of the incident.[52]

---

[49] Complaint, ¶ 36.

[50] Id. at ¶ 41.

[51] Id., at ¶ 45.

[52] Rec. Doc. 73-1, McClendon Decl. ¶ 9; Rec. Doc. 92-4.

In opposing, Tapps argues that she does allege specific actions by McClendon that would lead to the conclusion that he was acting as a police officer, namely, that McClendon arrived at her residence in his JPSO uniform, driving his marked JPSO unit, brandishing his JPSO-issued firearm, and threatening to take Tapps to jail if she did not comply with his request. Considering those circumstances, Tapps argues that the fact that McClendon stated at one point that he was a "private citizen" is irrelevant. Tapps also emphasizes that McClendon's off-duty status is not dispositive under Fifth Circuit precedent, contending that the fact that McClendon may have been acting for personal reasons and/or as an agent for and on behalf of Hum during the encounter does not preclude a finding that he was acting "under color of law". See Tyson, 508 F.4th at 522.  The issue according to Tapps is whether McClendon "abuse[d] the position given to him by the State" by acting under "under 'pretense' of law." West, 487 U.S. at 49-50; Screws v. United States, 325 U.S. 91 (1945). Tapps suggests that it was precisely because McClendon was cloaked by the trappings of police power that Siddiqui asked McClendon to "pick up the keys" from Tapps rather than do so himself.

Under the facts of the present case, the court finds that reasonable jurors could conclude that McClendon acted under color of law. In United States v. Tarpley, defendant Tarpley, an off-duty police officer, assaulted a man who had an affair with Tarpley's wife inside Tarpley's home. 945 F.2d at 809.  While clearly pursuing a non-police aim, Tarpley used his service weapon, identified himself as a police officer, and claimed to have authority to assault the victim due to his status as a police officer. On these facts, the Fifth Circuit found sufficient evidence for a jury to conclude that Tarpley, although off-duty, not in uniform, and acting for

18

purely personal purposes, acted under color of law, because "the air of official authority pervaded the entire incident." Id.

In the instant case, McClendon arrived at Tapps' home in a marked cruiser, uniformed, and holstered his gun as the door was answered. He allegedly threatened to "put out" Tapps, and ran her name for attachments. Tapps contends that he blocked her exit with his cruiser. He intercepted Kenner Police Officer Seals on his way to respond to Tapps' call and repeatedly insisted that she be taken to jail, while uniformed, in his marked cruiser, and without informing Officer Seals that he was off-duty. These events, if proven, suggest that an "air of official authority" pervaded the incident. On these facts, a reasonable juror could find that McClendon abused his power acting under pretense of law, and accordingly, Sheriff Lopinto is not entitled to summary judgment based on a finding that McClendon did not act under color of law.

### 3. Official Policy or Custom

Plaintiff's complaint alleges that Sheriff Lopinto "acted unreasonably, recklessly, and with deliberate indifference" through institutional policies and practices that "resulted in the negligent hiring, retention, and supervision of JPSO deputies, including McClendon."[53] Sheriff Lopinto argues that she has not identified any policy, pattern, or practice related to supervision or training or hiring that was the alleged moving force behind any alleged constitutional harm.

Thus, the question is whether the alleged negligent hiring of McClendon is sufficient to evidence a policy or practice of the JPSO. The Supreme Court has recognized that "a cause of action under § 1983 based on a single decision attributable to a municipality" is possible,

---

[53] Complaint ¶¶ 74-76.

however, a single decision policy may be found "only where the evidence that the municipality had acted and that the plaintiff had suffered a deprivation of federal rights also proved fault and causation." Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown, 520 U.S. 397, 405 (1997). In a case alleging negligent hiring due to failure to properly vet an applicant, "[t]he fact that inadequate scrutiny of an applicant's background would make a violation of rights more likely cannot alone give rise to an inference that a policymaker's failure to scrutinize the record of a particular applicant produced a specific constitutional violation." Id. at 410-11. Rather, a "plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." Id. at 411. Thus, while the fact that plaintiff's suit is premised on a single hiring decision does not foreclose liability of Sheriff Lopinto, to prevail, she must establish it was done with deliberate indifference.

     "Deliberate indifference exists 'where adequate scrutiny of an applicant's background would lead a reasonable supervisor to conclude that the plainly obvious consequences of the decision to hire would be the deprivation of a third party's constitutional rights.' " Gomez v. Galman, 18 F.4th 769, 778 (5th Cir. 2021) (quoting Gros v. City of Grand Prairie, 209 F.3d 431, 433–34 (5th Cir. 2000) (other citations omitted). To establish deliberate indifference in a negligent hiring case, "the connection between the background of the individual and the specific violation alleged must be strong, [and] the plaintiff 'must show that the hired officer was highly likely to inflict the particular type of injury [she] suffered.' " Id. at 434 (citing Board of County Comm'rs v. Brown, 520 U.S. 397 (1997)). A plaintiff cannot defeat summary judgment simply

because there was a probability that a poorly-screened officer would violate her protected

rights. Gros v. City of Grand Prairie, 209 F.3d 431, 433–34 (5th Cir. 2000) (citing Brown, 520

U.S. at 412).  Rather, a plaintiff  must show that the hired officer was highly likely to inflict the

particular type of injury suffered. Id.

Tapps has identified facts in the record which could permit a reasonable jury to find that

the decision to hire McClendon reflects deliberate indifference to the risk that the violation she

alleges would follow from McClendon's hiring. At the time of hiring McClendon, JPSO was

aware that the SJPSO had specifically concluded that McClendon must be terminated because

he posed a liability to that department, and he was ineligible for rehire. This conclusion was

reached after McClendon accumulated a lengthy disciplinary record involving incidents similar

to the one at issue here, had a restraining order in place against him, and was prohibited from

possessing or carrying a firearm in California. In addition, JPSO's reference check was

responded to with a directive to "Contact IAD!" Because on these facts a jury could reasonably

find that the harm alleged by Tapps was the likely result of the failure to adequately scrutinize

McClendon's disciplinary history, and Sheriff Lopinto acted with deliberate indifference to that

risk, summary judgment is precluded on this issue.[54]

### C. State Law Claims

Tapps has also brought claims under Louisiana state law due to Sheriff Lopinto's failure

---

[54] The court also notes that McClendon testified that "[s]omebody in personnel" at JPSO told him "that they'd be more concerned if they got a good report about a deputy." Rec. Doc. 112-5, McClendon Depo., 169:14-17. While McClendon's statement is inadmissible hearsay, if the declarant were to testify at trial it would suggest the existence of a widely-known JPSO policy to hire deputies with bad disciplinary histories.

to "exercise reasonable care in the hiring" of McClendon, because JPSO's "pre-hiring investigation of . . . McClendon was grossly inadequate and did not appropriately account for his history of misconduct."[55] Sheriff Lopinto argues that these claims must be dismissed because pursuant to La. R.S. 9:2798.1, a Parish Sheriff is immune from such claims. Tapps counters that the cited statute does not immunize reckless acts or operational negligence, which are alleged in this case.

La. Rev. Stat. § 9:2798.1 provides:

> Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties.

La. Rev. Stat. § 9:2798.1(B). However, the provisions of La. Rev. Stat. § 9:2798.1(B) do not apply "(1) [t]o acts or omissions which are not reasonably related to the legitimate governmental objective for which the policymaking or discretionary power exists; or (2) [t]o acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct." La. Rev. Stat. 9:2798.1 (C).

"The list in paragraph (C)(2) of La. R.S. 9:2798.1—acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct—connotes conduct more severe than negligent behavior. Recklessness is, in effect, 'gross negligence.' " Mariana v. Magnolia Auto Transp., LLC, 341 So. 3d 1281, 1291 (La. App. 5 Cir. 5/26/22); see also, Rabalais v. Nash, 952 So. 2d 653, 658 (La. 3/9/07). "Gross negligence is

---

[55] Complaint, ¶¶ 104-109.

the want of that diligence that even careless persons are accustomed to exercise, amounting to a complete neglect of the rights of others." Nuccio v. City of Slidell, 2023 WL 2947542, at *3 (La. App. 1 Cir. 4/14/23). Public entities have been found to have acted recklessly when making hiring decisions. See, e.g., Gillespie v. Calcasieu Par. Sch. Bd., 179 So. 3d 966, 968 (La. App. 3 Cir. 12/2/15), writ denied, 2016-0011 (La. 2/26/16) (School board's decision to re-hire teacher was reckless where board knew of the teacher's past misconduct and ineligibility for rehire at prior employer).

In this case, JPSO knew that McClendon had an extensive disciplinary history at SCPSO, had resigned while under investigation, was not eligible for re-hire, and that he was subject to a restraining order, among other bad behavior. Further, JPSO did not follow up on McClendon's disciplinary history and ineligibility for re-hire, despite the fact that in a response to a reference request, the Human Resources department of his immediate past employer, SCPSO, directed JPSO to "Contact IAD!" On this record, a jury could reasonably find that JPSO's failure to follow up at SCPSO and its approval of McClendon's application despite numerous red flags, demonstrates that JPSO acted recklessly when it deliberately ignored warning signs and placed McClendon in a position of power as a sheriff's deputy. Accordingly, because fact issues are present as to whether Sheriff Lopinto acted recklessly in the negligent hiring of McClendon, he is not entitled to summary judgment finding him immune under La. R. S. 9:2798.1.[56]

---

[56] Having so found, the court pretermits the question whether immunity is also precluded because plaintiff alleges negligence in operational decisions.

23

### III. CONCLUSION

In sum, the record evidence submitted demonstrates, *inter alia*, the existence of fact issues on whether a constitutional violation occurred, whether McClendon acted under color of law, and whether Sheriff Lopinto acted with recklessness and deliberate indifference in the negligent hiring of McClendon. Accordingly, summary judgment dismissing plaintiff's claims against Sheriff Lopinto is not warranted and therefore,

**IT IS HEREBY ORDERED** that the **Motion for Summary Judgment** (Rec. Doc. # 92) filed by defendant, Sheriff Joseph Lopinto, is **DENIED**.

New Orleans, Louisiana, this   6th   day of September, 2023.

**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**

24